UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH GREGORY DUNBAR,

                Plaintiff,                                            Hon. Hala Y. Jarbou

v.                                                                   Case No. 1:18-cv-1355

DAVID HUYGE, et al.,

                Defendants.

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on the Motion for Summary Judgment of Defendants Butler and Greiner (MDOC Defendants) (ECF No. 155) and the Motion for Summary Judgment of Defendants Huyge and Emami (Corizon Defendants) (ECF No. 159). Plaintiff has filed a response. (ECF No. 168.) Pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that both motions be **GRANTED** and that judgment be entered for Defendants.

## I.  BACKGROUND

Plaintiff, a prisoner incarcerated with the Michigan Department of Corrections (MDOC), filed a complaint on December 6, 2018, against a number of Defendants, alleging claims arising out of events that occurred while Plaintiff was incarcerated at Ionia Correctional Facility (ICF) in Ionia, Michigan. Subsequently, Plaintiff supplemented his complaint to add additional Defendants and claims based on events that occurred at Lakeland Correctional Facility (LCF) after Plaintiff transferred there in December 2018. As a result of prior rulings in the case, Plaintiff's remaining claims are: (1) that Defendants Mental Health Professional Margaret Greiner, Psychiatrist Esmaeil Emami, M.D., and Psychologist Dana Butler violated Plaintiff's Fourteenth Amendment right to

1

due process in connection with an October 23, 2018 involuntary mental health panel hearing; and (2) that Defendant David Huyge, P.A. violated Plaintiff's Eighth Amendment rights by failing to treat his hepatitis C and his colon cancer.

### A.   Plaintiff's Allegations

Plaintiff alleges the following facts regarding Defendant Huyge. For eight months, Plaintiff had a burning pain in his abdomen, which Defendant Huyge told Plaintiff was an abdominal strain that they (the medical staff) did not treat. Although Plaintiff wrote grievances during that time, no tests, X-rays, or MRIs were performed. On April 18, 2018, Plaintiff was sent to McLaren Hospital in Lansing from Sparrow Hospital in Ionia with "three pints of blood missing." (ECF No. 1 at PageID.3.) Plaintiff was diagnosed with colon cancer and told that he had a large cancerous tumor in his lower abdomen. The tumor was removed that day.

Plaintiff alleges that, in 2006, MDOC employees injected him with hepatitis C and that he has not received any treatment for this condition. Plaintiff appears to allege that Defendant Huyge failed to treat his hepatitis C. In a chronic care check-up of unspecified date, Defendant Huyge told Plaintiff that they were going to operate on his brain, and Plaintiff asked Defendant Huyge when he was going to do something about the burning pain in Plaintiff's stomach that was preventing him from working out.

Regarding Defendants Greiner, Emami, and Butler, now-dismissed Defendant Saad arranged a hearing before a panel of mental health care providers to determine whether an involuntary mental health treatment order for Plaintiff was warranted. On October 23, 2018, a mental health panel comprised of Defendants Greiner, Emami, and Butler found Plaintiff mentally ill and in need of mental health treatment. Plaintiff claims that during the panel hearing, he was denied his rights to present evidence, cross-examine witnesses, and present his own witnesses.

### B.    Medical Health Evidence

In support of his motion, Defendant Huyge has submitted Plaintiff's medical records from April 3, 2017 through December 19, 2018, while he was housed at ICF. The 160 pages of records, which will be discussed below, demonstrate that Plaintiff received extensive treatment of his medical needs at ICF during this period.

### 1.    Hepatitis C

On April 11, 2017, Defendant Huyge saw Plaintiff for a hepatitis C follow up. Defendant Huyge noted that the problem was stable, but Plaintiff was refusing all lab tests, stating, "I'm good, I'm getting out soon and will worry about that stuff on the outside." Plaintiff denied any medical complaints. (ECF No. 159-1 at PageID.1182.)

Defendant Huyge next saw Plaintiff regarding his hepatitis C on August 8, 2017. The condition was stable, and the severity level was mild. Once again, Plaintiff refused all lab work. (*Id.* at PageID.1186.) Defendant Huyge saw Plaintiff on February 1, 2018 to follow up on his Hepatitis C. The problem was stable and severity was mild. Defendant Huyge encouraged Plaintiff to have lab tests, but Plaintiff refused. Plaintiff was advised of the risks of refusing lab tests, including death and disability. (*Id.* at PageID.1194–95.)

On February 21, 2018, R.N. Fletcher completed Plaintiff's annual nurse encounter visit. She noted that Plaintiff was non-compliant with his hepatitis C treatment. (*Id.* at PageID.1196.) On April 4, 2018, R.N. Fletcher saw Plaintiff for complaints of polyuria and abdominal pain that had grown worse for about a week. R.N. Fletcher noted that Plaintiff had been non-compliant with his Hepatitis C treatment and had not had labs since 2012. (*Id.* at PageID.1198.)

### 2.    Colon Cancer

On April 18, 2018, Plaintiff was taken to Sparrow Hospital for abdominal pain. He had a history of lower cramping abdominal pain and pain with urination for several months. (ECF No.

3

159-1 at PageID.1212.) On examination at Sparrow, Plaintiff's abdomen was soft, with a normal appearance and bowel sounds. He was positive for tenderness in the right upper quadrant and right lower quadrant. A CT scan showed a necrotic mass in the right lower quadrant measuring six by 5 centimeters, with invasion of the musculature of the abdominal wall. (*Id.* at 1214, 1217.) Later that day, Plaintiff was transferred to McLaren Hospital, where he received a blood transfusion and underwent surgery to remove the abdominal mass. The surgeon indicated a concern for adenocarcinoma of the colon. In addition, a CT scan of Plaintiff's chest showed a pulmonary embolism, for which Plaintiff was started on Lovenox. Plaintiff was discharged back to the MDOC on April 25, 2018. Due to his surgery, Plaintiff would have to wait about four weeks to receive chemotherapy. (*Id.* at PageID.1221.)

Plaintiff's records show that he initially complained about pain in his lower stomach in April 2017. On April 4, 2017, Plaintiff reported abdominal pain to R.N. Fletcher, which he had been experiencing on and off "for months." R.N. Fletcher performed a urine dipstick, which indicated that white blood cells were present, but blood was not. The onsite provider approved a verbal order for Cipro twice daily at the med line and to send Plaintiff's urine to the lab. RN Fletcher advised Plaintiff to increase his fluid intake and to take an over-the-counter medication of choice for discomfort. (*Id.* at PageID.1178–79.) Plaintiff followed up with RN Fletcher on April 14 for a recheck of his urinary tract infection (UTI) symptoms. Plaintiff stated he had completed the Cipro and was feeling better, but still had burning in his abdomen. Plaintiff indicated that he had spoken to Defendant Huyge about the burning pain during his recent appointment for his hepatitis C. Plaintiff did not report any further complaints. (*Id.* at PageID.1185.)

On August 15, 2017, R.N. Treynor saw Plaintiff for complaints of difficulty urinating and tenderness in his lower abdomen. Plaintiff had no signs or symptoms of distress and had a normal

temperature. (*Id.* at PageID.1188.) On August 16, 2017, R.N. Edwards saw Plaintiff for lower abdominal discomfort and urgency and frequency of urination. R.N. Edwards noted that Plaintiff had pain in his lower abdomen upon light palpitation. She contacted the physician, who ordered Cipro 500 m.g. (*Id.* at PageID.1189–90.) On August 21, 2017, Roger Gerlach, M.D., ordered a urine culture and urinalysis. (*Id.* at PageID.1192–93.)

On February 21, 2018, R.N. Fletcher completed Plaintiff's annual nurse encounter visit. Plaintiff reported that he had had pain in his abdomen since 2006 and said he had a hernia. Plaintiff said that he had just seen the P.A. and spoke to him about the pain. R.N. Fletcher found no hernia on the problem list and found no evidence of one on examination. (*Id.* at PageID.1196.)

On April 4, 2018, Plaintiff submitted a healthcare kite complaining of a UTI and pain in his stomach muscles. (*Id.* at PageID.1197.) Later that day, R.N. Fletcher saw Plaintiff for complaints of worsening polyuria and abdominal pain. Plaintiff reported a history of abdominal pain since 2007 and said it was worse after exercising. He informed R.N. Fletcher that Defendant Huyge told him that he had strained his muscles. Plaintiff admitted that he had recently started doing exercises on the stairs and had not taken any OTC medication for the discomfort. R.N. Fletcher noted diffuse tenderness over the entire abdomen. She discussed Plaintiff's presentation with Defendant Huyge, who started Plaintiff on Cipro. R.N. Fletcher gave Plaintiff Motrin and instructed him to increase his fluids. (*Id.* at PageID.1199.)

On April 10, 2018, Plaintiff reported to R.N. Edwards that he had been experiencing abdominal pain since April 4 and said that the pain was getting worse. R.N. Edwards noted a nickel-size bulge in the lower right quadrant of the abdomen. She ordered a chart review. (*Id.* at PageID.1202–03.) On April 13, 2018, Plaintiff was seen by R.N. Beechler after being up all night with urinary frequency. His urinalysis dip was negative, with no white blood cells or blood present.

R.N. Beechler instructed Plaintiff to increase his fluid intake, urinate on a regular basis and try to empty his bladder every time, and use over-the-counter medication for pain as needed. (*Id.* at PageID.1204–05.)

On April 17, 2018, Defendant Huyge scheduled an appointment to see Plaintiff for his urinary issues. (*Id.* at PageID.1206.) The same day, R.N. Fletcher saw Plaintiff for a recheck of his urinary symptoms. A urinalysis was within normal limits. R.N. Fletcher spoke to Plaintiff about the need for labs and Plaintiff agreed. R.N. Fletcher discussed the labs with Defendant Huyge, who ordered a comprehensive metabolic panel with complete blood count, platelet, and thyroid lab draw. (*Id.* at PageID.1207–08.) Later that day, R.N. Doolittle saw Plaintiff after Garcia Labs reported that Plaintiff had a critical hemoglobin level of 5.6. Plaintiff reported to RN Doolittle that he had been feeling very cold, his hands were turning a different color, and he still had pain with urination, but his biggest complaint was abdominal pain. (*Id.* at PageID.1210.) Plaintiff was sent to Sparrow Hospital the following day, and then to McLaren Hospital for the surgery.

On April 26, 2018, Defendant Huyge saw Plaintiff for a follow up after the surgery. Plaintiff stated that he felt okay with some weakness and abdominal muscle pain. Defendant Huyge ordered Ensure, Ultram, Flomax, Lovenox, and a complete blood cell count. He noted that the scheduler was to speak with the oncologist's office and notify the medical provider of the need for a consultation request (407) for a PET scan and oncology follow up visits. (*Id.* at PageID.1225–27.) On April 30, 2018, Defendant Huyge submitted a 407 for a PET scan and oncology consultation scheduled for May 17, 2018. (*Id.* at PageID.1228–30.) Defendant Huyge also submitted lab orders for various tests. (*Id.* at PageID.1233.) Defendant Huyge saw Plaintiff later that day for a follow-up visit. Plaintiff said that he was feeling "okay" and was taking his meds as

ordered. Defendant Huyge submitted a non-formulary medication request for Ultram 100 mg. (*Id.* at PageID.1235–38.)

On May 9, 2018, Dr. Papendick approved Defendant Huyge's request for a PET scan and oncology consult. (*Id.* at PageID.1244–45.) On May 17, 2018, Plaintiff underwent a PET scan at McLaren Hospital. The scan results showed no evidence of metastatic disease. (*Id.* at PageID.1251, 1255.) On May 23, 2018, Plaintiff was seen by Dr. Layhe at the Karmanos Cancer Institute. Dr. Layhe advised Plaintiff that he would need chemotherapy in an adjuvant fashion but that Plaintiff needed to get his other issues under control before starting the treatment. She advised Plaintiff of the risks of not taking anything for his blood clot and noted that he could be converted to Coumadin. She also "strongly encouraged" Plaintiff to take the Lovenox injection (which he was refusing) for his pulmonary embolism. (*Id.* at PageID.1256–58.)

On May 29, 2018, Plaintiff reported to Defendant Huyge that Dr. Layhe said she wanted him to "start #2 chemo drugs." Plaintiff said that he was feeling better, had increased energy, and had gained three pounds. On May 30, 2018, Defendant Huyge discussed starting Coumadin with Plaintiff, which Plaintiff agreed to do. Defendant Huyge submitted a 407 for an oncology follow up, which Dr. Papendick approved on June 7, 2018. (*Id.* at PageID.1261–71.)

On June 4, 2018, during a provider visit, Plaintiff reported to Defendant Huyge that he was feeling better overall, his abdominal pain had resolved, and he was taking his medication as directed. Defendant Huyge ordered Plaintiff to continue his current medical regimen and ordered Prothrombin Time lab draws through June 11, 2018. (*Id.* at PageID.1268.) Plaintiff saw Dr. Layhe for an oncology follow-up on June 11, 2018. Dr. Layhe discussed starting chemotherapy in the form of Xeloda tablets. Plaintiff expressed anxiety regarding possible side effects of chemotherapy. Dr. Layhe indicated that Plaintiff was eligible for CapeOx therapy that would

include IV Oxallplatin. Due to Plaintiff's continued diarrhea and anxiety, however, he was to be started on single agent Xeloda for the first cycle, and Dr. Layhe would discuss adding Oxallplatin to his subsequent cycles. Plaintiff would not need to be transferred to a specialized facility for his treatment. (*Id.* at PageID.1273–74.)

On June 13, 2018, pursuant to Dr. Layhe's treatment notes, Defendant Huyge submitted a nonformulary request for Xeloda 500 mg oral tablets for Plaintiff and a 407 for a chemotherapy follow-up visit with Dr. Layhe. Both requests were approved. (*Id.* at PageID.1282–86.) On June 15, 2018, Plaintiff informed R.N. LeBarre that he was not going to take his oral chemotherapy medication while at ICF. Plaintiff said that he should be at a facility such as Coldwater or Duane Waters Hospital that was better equipped to handle the possible side effects of Xeloda. R.N. LeBarre explained to Plaintiff that he did not meet the criteria for those beds and asked Plaintiff if he understood the possibility of death or cancer spreading if Plaintiff declined treatment, and Plaintiff replied, "I'll probably die anyway." (*Id.* at PageID.1290.)

On June 18, 2018, Defendant Huyge saw Plaintiff for a provider visit and noted that he was supposed to start chemotherapy on June 16, 2018, but was refusing the treatment while he was at ICF. Huyge had a lengthy discussion with Plaintiff about the risks of refusing treatment. Plaintiff said that he understood and accepted the risks. Plaintiff refused to sign a Release of Responsibility (ROR) and refused to contact the psych team. (*Id.* at PageID.1291–95.) Later that day, Lisa Dean, L.M.S.W., evaluated Plaintiff to determine his capacity to refuse treatment and whether he would benefit from mental health treatment. She found that Plaintiff was aware of the consequences of refusing treatment and that he had no current need for mental health treatment. (*Id.* at PageID.1296.)

On June 19, 2018, Defendant Huyge and R.N. LeBarre met with Plaintiff to encourage him to start chemotherapy. Plaintiff refused, stating that other inmates would take advantage of him due to the effects of chemotherapy. (*Id.* at PageID.1299.) On June 25, 2018, R.N. LeBarre met with Plaintiff to discuss the option of transferring him to LCF, at his request, as a condition of his acceptance of the chemotherapy treatment. Plaintiff said that he was scared and was not going to take the treatment. Plaintiff reported that he felt good, was exercising and eating, and did not feel like he had cancer or was sick. R.N. LeBarre again explained the risks of non-treatment, and Plaintiff said that he would take the risk. (*Id.* at PageID.1301.) Later that day, Hanna Saad, M.D., saw Plaintiff for a psychiatric evaluation at the request of the medical team. Dr. Saad opined that Plaintiff would likely require a higher level of care, involuntary mental health treatment, and a guardian to make medical decisions. (*Id.* at PageID.1302–04.)

Plaintiff was transferred to Woodland Correctional Facility on July 6, 2018, and was transferred back to ICF on July 17, 2018. An Intrasystem Transfer Summary dated July 17, 2018 indicated that Plaintiff currently had no symptoms of psychosis, depression, anxiety, or aggression. (*Id.* at PageID.1307.)

On July 24, 2018, Plaintiff complained of pain in his lower abdomen. On July 25, 2018, Defendant Huyge performed a chart update indicating that he would discuss the issue with Plaintiff at his upcoming appointment on July 27, 2018. (*Id.* at PageID.1310–11.) On July 26, 2018, R.N. Fletcher saw Plaintiff to discuss his UTI problems. Plaintiff stated he wanted off med line because he had cancer and could not be expected to "do all that walking every day!" R.N. Fletcher told Plaintiff to discuss his issues with Defendant Huyge during his appointment scheduled the next day, but Plaintiff said he would not see Defendant Huyge. When R.N. Fletcher encouraged Plaintiff to attend the appointment, Plaintiff said that he would show up but would refuse the

9

appointment. (*Id.* at PageID.1312–13.) The next day, July 27, Plaintiff went to his appointment but refused to see Defendant Huyge. (*Id.* at PageID.1314.) Plaintiff refused another appointment with Defendant Huyge on August 13, 2018. (*Id.* at PageID.1316.) The same day, L.P.N. Tribble noted that Plaintiff had refused all meds in August and most of July and was not going to med lines. (*Id.* at PageID.1317.)

On August 17, 2018, Plaintiff refused to attend an appointment with R.N. LeBarre to discuss his refusals of treatments, visits with healthcare, and medication. She noted that she would share the information with the provider and would discuss the case with mental health to see what interventions may be indicated. (*Id.* at PageID.1319.) On September 4, 2018, Plaintiff refused the Pneumococcal Polysaccharide vaccine that Defendant Huyge had ordered. Plaintiff stated that he did not need the vaccine because his cancer was gone. (*Id.* at PageID.1321.) Plaintiff refused another appointment with Defendant Huyge on September 14, 2018. Defendant document that Plaintiff continued to refuse treatment, provider visits, bloodwork, and vitals. (*Id.* at PageID.1322.)

On October 19, 2018, Defendant Huyge saw Plaintiff for a scheduled visit. Plaintiff stated that he felt great, had been working out with weights and doing yoga, and read a book about a lady who cured cancer by exercising. Plaintiff stated he currently was not taking any medications. Defendant Huyge encouraged Plaintiff to accept lab draws, a digital rectal evaluation, and a fecal occult blood test, but Plaintiff refused. (*Id.* at PageID.1324–25.) On October 24, 2018, R.N. LeBarre met with Plaintiff at the request of the warden. Plaintiff indicated that he was willing to accept treatment for his cancer because he trusted the warden. Plaintiff said that he would do whatever was necessary but wanted to make sure that it would not harm his liver. R.N. LeBarre told Plaintiff that the provider and Dr. Layhe would have to determine his plan of care. (*Id.* at PageID.1327.) On November 15, 2018, Plaintiff reported to healthcare for a lab draw ordered by

10

Dr. Layhe. Plaintiff informed the office that he wanted to sign off because the warden did not hold up his end of their agreement. Plaintiff stated that he would not do the lab draws and left the clinic. (*Id.* at PageID.1334.) On November 16, 2018, Defendant Huyge reviewed Plaintiff's chart noting his recent refusal. (*Id.* at PageID.1335.) This was Defendant Huyge's last involvement with Plaintiff's care, as Plaintiff transferred to LCF on December 20, 2018. (*Id.* at PageID.1336; ECF No. 159-3 at PageID.1356.)

### C.    Mental Health Evidence

On October 15, 2018, J. Guastella, M.A. L.L.P., conducted a Qualified Mental Health Professional Examination (QMHP). Plaintiff had been referred for involuntary treatment after he presented with significant delusions of persecution and paranoia and refused mental health treatment. Ms. Guastella reported that Plaintiff had delusions that the MDOC had infected with him with diseases, owed him $6 million from a lawsuit, and was using health care and mental health to conspire against him. (ECF No. 156-2 at PageID.1065.) Ms. Guastella recommended that Plaintiff go before a mental health care panel to establish the appropriateness of involuntary treatment. (*Id.* at PageID.1066.) That same day, Plaintiff was evaluated by Dr. Saad, for the purpose of advising the panel of Plaintiff's mental health needs. Dr. Saad determined Plaintiff to be mentally ill and in need of treatment, specifically noting that his psychosis and non-compliance with treatment were negatively affecting his judgment. In particular, Plaintiff stated that a federal judge had ordered him released from prison, that the MDOC infected him with hepatitis C, and that the MDOC was trying to cover up the consequences of a lawsuit he had filed to avoid criminal charges. (*Id.* at PageID.1067–68.)

Plaintiff's panel hearing was set for October 23, 2018. In preparation for the hearing, Brian Van't Hof, a clinical social worker acting as Plaintiff's advisor, served Plaintiff with a Notice of Hearing and other required documents. (*Id.* at PageID.1074; ECF No. 156-3 at PageID.1083.) The

Notice of Hearing advises the prisoner of his right to present evidence and witnesses and to cross-examine witnesses. It also advises the prisoner of his right to appeal the decision of the Hearing Committee. (ECF No. 156-3 at PageID.1084.) Plaintiff did not agree with the treatment recommendations and did not waive his right to a hearing. (ECF No. 156-2 at PageID.1075.)

On October 23, 2018, a panel of mental health providers consisting of Defendants Emami, Butler, and Greiner conducted a hearing to receive evidence regarding Dr. Saad's findings and recommendations and Plaintiff's objections.[1] (*Id.* at PageID.1076.) Mr. Van't Hof attended the hearing as Plaintiff's advisor. During the hearing, Dr. Saad testified that he had diagnosed Plaintiff with psychotic disorder and that Plaintiff was refusing medically-necessary treatment for his mental health, as well as for his cancer diagnosis. Dr. Saad's proposed treatment included medication management with Risperdal. When given the opportunity to ask questions of Dr. Saad, Plaintiff asked him about coughing in Plaintiff's face during the evaluation and whether Dr. Saad had read an order from the Sixth Circuit, which Dr. Saad said he had not. Defendant Butler asked Plaintiff whether he had any evidence to present. Plaintiff said that he had filed two grievances against Dr. Saad for harassment. When asked if he had any evidence or argument for the panel, Plaintiff said that he had documents that the wanted to read into the record. Those documents included court documents from his sentencing court, as well as the United States Court of Appeals for the Sixth Circuit, which Plaintiff claimed showed that he had been sentenced to 20 to 40 years rather than 40 to 60 years. Defendant Butler told Plaintiff that the panel could not review the documents while they were on the record but would review them if Plaintiff submitted them for review. Although Plaintiff was concerned about not getting his documents back, he ultimately

---

[1] The MDOC Defendants have submitted a CD containing a recording of the hearing. Plaintiff listened to the recording on October 8, 2019. (ECF No. 156-4 at PageID.1103; ECF No. 156-5 at PageID.1115.)

agreed to give the documents to the panel to make copies. Defendant Butler then asked whether there was anything else to be brought to the panel's attention. Mr. Van't Hof and Plaintiff responded, "No."

The panel reviewed the evidence and unanimously concluded that Plaintiff was mentally ill and that Dr. Saad's proposed treatment plan was suitable. A 90-day order was entered. (ECF No. 156-2 at PageID.1076.) Plaintiff, assisted by Mr. Van't Hof, appealed the panel's decision. On November 2, 2018, the Mental Health Director's designee affirmed the decision. (*Id.* at PageID.156-2.)

## II.  Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are facts that are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## III.  Discussion

### A.    Defendant Huyge

Plaintiff alleges that Defendant Huyge violated his Eighth Amendment rights by failing to treat his Hepatitis C, by failing to treat his abdomen pain in the months prior to his surgery to remove the tumor, and, possibly, by failing to treat his colon cancer.

The Eighth Amendment's prohibition against cruel and unusual punishment applies not only to punishment imposed by the state, but also to deprivations that occur during imprisonment and are not part of the sentence imposed. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Estelle v. Gamble*, 429 U.S. 97, 101-02 (1976). Punishment that is without penological justification or involves the unnecessary and wanton infliction of pain also violates the Eighth Amendment's proscriptions. *See Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). In other words, the Eighth Amendment prohibits "the gratuitous infliction of suffering." *Gregg v. Georgia*, 428 U.S. 153, 183 (1976).

The unnecessary and wanton infliction of pain encompasses "deliberate indifference" to an inmate's "serious medical needs." *Estelle*, 429 U.S. at 104-06; *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001). Determining whether denial of medical care amounts to an Eighth Amendment violation involves two steps. First, the court must determine, objectively, whether the alleged deprivation was sufficiently serious. A "serious medical need" sufficient to implicate the Eighth Amendment is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008). Thus, the objective component is satisfied where a prisoner receives no treatment for a serious medical need. *See Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018). If the plaintiff's claim, however, is based on "the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious," *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 898 (6th Cir. 2004), the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Napier*, 238 F.3d at 742 (internal quotation marks omitted).

If the plaintiff satisfies the objective component, he must then demonstrate that the defendant possessed a sufficiently culpable state of mind:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837 (1994). *Id.* at 837. In other words, the plaintiff "must present evidence from which a trier of fact could conclude 'that the official was subjectively aware of the risk' and 'disregard[ed] that risk by failing to take reasonable measures to abate it.'" *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) (citing *Farmer*, 511 U.S. at 829, 847). To satisfy this part of the analysis, the plaintiff must demonstrate that the defendant acted with "deliberateness tantamount to intent to punish." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 813 (6th Cir. 2005).

"A doctor is not liable under the Eighth Amendment if he or she provides reasonable treatment, even if the outcome of the treatment is insufficient or even harmful." *Rhinehart*, 894 F.3d at 738 (citing *Farmer*, 511 U.S. at 844). So long as a doctor does not knowingly expose a prisoner to an excessive risk of serious harm and exercises reasonable medical judgment, the Sixth Circuit will defer to the doctor's judgment. *Id.* "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). Moreover, where the plaintiff's claim amounts to disagreement with the medical provider's judgment or approach to medical treatment, the claim against the defendant-provider fails. *See White v. Corr. Med. Servs.*, 94 F. App'x 262, 264 (6th Cir. 2004).

First, to the extent Plaintiff claims that Defendant Huyge failed to treat his hepatitis C, the medical record refutes this assertion. As set forth above, Defendant Huyge saw Plaintiff on three

15

occasions to follow up on Plaintiff's hepatitis C during the relevant period, noting each time that the condition was stable, and the level of severity was mild. Plaintiff's records also show that on each visit, Plaintiff refused all testing, even though Defendant Huyge educated him regarding the risks associated with refusing treatment. Similarly, R.N. Fletcher noted that Plaintiff had been noncompliant with his hepatitis C treatment and had not had labs since 2012. Given Plaintiff's voluntary refusal to comply with his hepatitis C treatment, his Eighth Amendment claim against Defendant Huyge regarding failure to treat hepatitis C lacks merit. *See Palmer v. Wagner*, 3 F. App'x 329, 331 (6th Cir. 2001) ("Palmer's voluntary refusal to complete the physical therapy as ordered precludes an Eighth Amendment claim against Wagner."); *Johnson v. Allen*, No. 1:15-cv-1329, 2016 WL 860428, at *4 (W.D. Mich. Mar. 7, 2016) ("Prison officials are not deliberately indifferent to a prisoner's serious medical needs when the prisoner refuses to accept medical treatment.").

Although Plaintiff states in his declaration that he received no treatment for his hepatitis C from Defendant Huyge or any other MDOC medical provider and was told that he was not being treated because some people can live with the disease without treatment and it appeared that Plaintiff was one of those people (ECF No. 170 at PageID.1440), his assertion that he received no treatment is without merit. Plaintiff's medical record shows that Plaintiff was seen periodically to follow-up on his hepatitis C, which was noted to be stable and of mild severity. Plaintiff does not deny that he refused all lab tests, and he fails to articulate what treatment he believes he should have received for his hepatitis C or how the lack of such unspecified treatment exposed him to an unreasonable risk of harm. *See Dodson v. Wilkinson*, 304 F. App'x 434, 440 (6th Cir. 2008) ("Dodson's disagreement with the testing and treatment he has received since being diagnosed with Hepatitis C does not rise to the level of an Eighth Amendment violation.").

Next, Plaintiff complains that Defendant Huyge was deliberately indifferent in failing to treat Plaintiff's abdominal pain for eight months and that Defendant Huyge told Plaintiff that his pain was caused by an abdominal strain that they did not treat. Plaintiff alleges that Defendant Huyge failed to provide pain medication, x-rays, or MRIs for his pain. Although Plaintiff's medical records reflect that he mentioned to other medical personnel that he discussed his abdominal pain with Defendant Huyge, none of the records of Plaintiff's visits with Defendant Huyge indicate that Plaintiff had actually raised the issue of abdominal pain with Defendant Huyge at any time prior to the surgery. For example, on April 11, 2017, August 8, 2017, and February 1, 2019, during hepatitis C follow-ups, Defendant Huyge noted that Plaintiff was negative for abdominal pain. (ECF No. 159-1 at PageID.1183, 1187, 1195.) Plaintiff did report abdominal pain to other medical providers prior to his surgery, but it was generally in connection with his complaints of urinary difficulty, which was treated with Cipro. (*Id.* at PageID.1185, 1188–91.) Plaintiff also reported abdomen pain due to a hernia to R.N. Fletcher, but on examination she found no evidence of a hernia. (*Id.* at PageID.1196.) Plaintiff subsequently complained to R.N. Fletcher that his abdomen recently started hurting after doing some exercise on the stairs, consistent with a muscle strain. Plaintiff was given Cipro and Motrin for pain. (*Id.* at PageID.1198–99.)

But accepting as true Plaintiff's allegation that Defendant Huyge diagnosed Plaintiff with an abdominal strain which they did not treat, he fails to present evidence to establish the subjective prong of his Eighth Amendment claim. That is, Plaintiff offers no evidence to show that Defendant Huyge was subjectively aware of an excessive risk of serious harm to Plaintiff and disregarded it. Plaintiff's evidence might establish that Defendant Huyge was negligent or misdiagnosed his condition, but negligent medical care is not enough to implicate the Eighth Amendment. *See Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (citing *Estelle*, 429 U.S. at 105-06) ("Medical

malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Brown v. Kashyap*, 2000 WL 1679462 at *1 (6th Cir., Nov. 1, 2000) (citing Estelle, 429 U.S. at 106) (stating that "allegations of medical malpractice or negligent diagnosis and treatment" do not implicate the Eighth Amendment).

Finally, as to treatment of Plaintiff's colon cancer, the medical record, and Plaintiff's own admissions, show that Defendant Huyge was not deliberately indifferent to Plaintiff's serious medical need. Those records show that Defendant Huyge and others made repeated efforts to convince Plaintiff to take chemotherapy treatment for his colon cancer once diagnosed. Plaintiff admits as much. (ECF No. 170 at PageID.1441.) Plaintiff further admits that he refused treatment (*id.* at PageID.1443), and it is undisputed that Defendant Huyge arranged treatment for Plaintiff's condition, including a PET scan, oncology follow-up visits, and lab testing. In short, Plaintiff fails to show that Defendant Huyge was deliberately indifferent regarding Plaintiff's colon cancer treatment.

### B.    Defendants Emami, Butler, and Greiner

Plaintiff alleges that Defendants Emami, Butler, and Greiner denied him his right to present evidence, cross-examine witnesses, and present his own witnesses at the October 23, 2018 mental health hearing. I previously summarized the MDOC's involuntary mental health procedure as follows:

> The MDOC's procedure for the involuntary treatment of a prisoner with psychotropic medication is set forth in MDOC Policy Directive 04.06.183. This policy directive provides that a prisoner may be temporarily subjected to involuntary treatment with psychotropic medication where the following conditions are met: "a psychiatrist's certificate [is] executed which states [that] the prisoner is mentally ill," and the psychiatrist concludes that the prisoner "is a present danger to himself or herself or to others;" "the prisoner refuses treatment;" and the psychiatrist orders "involuntary administration of psychotropic medication pending the convening of a Hearing Committee." *See* Mich. Dep't of Corr. Policy Directive 04.06.183 ¶¶ Q-R.

18

Copies of the "Psychiatric Certificate, Psychiatric Report, QMHP [qualified mental health professional] Report, and a notice of hearing and rights [must be provided] to the prisoner and, if one has been appointed, to the guardian of the person" prior to the hearing committee being convened. *Id.* at ¶ S. The prisoner must be assigned a Mental Health Advisor and must not be medicated for twenty-four hours prior to the hearing. *Id.* at ¶ T. The hearing committee must consist of "a psychiatrist, a fully licensed psychologist, and another mental health professional whose licensure or registration requirements include a minimum of a baccalaureate degree from an accredited college or university, none of whom is, at the time of the hearing, involved in prisoner's treatment or diagnosis." *Id.* at ¶ C. The hearing committee must consider "the QMHP Report alleging that the prisoner is mentally ill, the Psychiatric Report, the Psychiatrist's Certificate, proof that a notice of hearing has been served, proof that the prisoner has not been medicated within 24 hours and any other admissible evidence presented at the hearing." *Id.* at ¶ W. The prisoner has the right to attend the hearing, may bring along his or her guardian, and is entitled to the assistance of his or her mental health advisor. *Id.* at ¶ X. The prisoner may present evidence, including witnesses, and may cross-examine witnesses. *Id.* The hearing committee must then "determine whether the prisoner is mentally ill and, if so, whether the proposed mental health services are suitable to the prisoner's condition. A finding of mental illness must be confirmed by the psychiatrist on the Hearing Committee to be valid." *Id.* at ¶ Y. The committee must prepare an official record of the hearing, and must present to the prisoner a report of its findings and orders, along with an appeal form. *Id.* at ¶¶ Z-AA. The initial period of treatment may not exceed ninety days. *Id.* at ¶ AA.   The prisoner may then appeal the hearing committee's decision to the Director of the Corrections Mental Health Program with the assistance of their mental health advisor; prisoner may then appeal that decision to the state circuit court.   *Id.* at ¶ DD. The policy also provides for renewal of the medication order. *Id.* at ¶¶ EE-FF. The prisoner is also entitled to a copy of the corrections mental health program ("CMHP") guidebook, which contains "rights information," and is to be offered an "opportunity to consult with staff from the Office of the Legislative Corrections Ombudsman." *Id.* at ¶ GG.

Because none of the members of the hearing committee may be involved in the inmate's current treatment or diagnosis, the MDOC policy provides for an independent decisionmaker. The policy also provides that the inmate has a right to be present at the hearing and present evidence, and can appeal the decision to the Director of the CMHP and the circuit court. Therefore, it is clear that the MDOC policy passes rational basis scrutiny and satisfies procedural due process.  *See Washington v. Harper*, 494 U.S. 210, 233-35 (1990).

(ECF No. 114 at PageID.112–13.) With the exception of the procedural deficiencies Plaintiff alleges, nothing in the record indicates that MDOC Policy Directive 04.06.183 was not followed in connection with the involuntary mental health process.

After listening to the recording of the October 23, 2018 mental health hearing and reviewing the other evidence in the record, I conclude that Plaintiff fails to establish a due process violation.

First, Plaintiff fails to show that the panel precluded him from submitting exhibits. It is undisputed that the panel accepted Plaintiff's exhibits, which consisted of copies of court documents, for consideration. That the panel refused to allow Plaintiff to read his documents into the record, and that it found that Plaintiff's documents had no bearing on its decision, do not give rise to a due process violation.

Second, Plaintiff was permitted to cross-examine Dr. Saad—the only witness who testified at the hearing. Plaintiff asked Dr. Saad about coughing in his face during the mental health examination and whether Dr. Saad had read an order from the Sixth Circuit pertaining to the length of Plaintiff's sentence.

Finally, Plaintiff's claim that he was not allowed to cross-examine witnesses is, in essence, his claim that he was precluded from calling witnesses. (ECF No. 156-5 at PageID.1114.) Plaintiff claims that he wanted to cross-examine Psychologist Guastella about her report and to question his work supervisor, Classification Director Tim Moore, about his good work reports, but he was not allowed to call these witnesses. (*Id.* at PageID.1112—13; ECF No. 170 at PageID.1444.) Mr. Van't Hof states in his affidavit that the Notice of Hearing advises the prisoner of his right to present evidence, including witnesses. (ECF No. 156-3 at PageID.1084.) Mr. Van't Hof further states that, had Plaintiff informed him that he intended to call witnesses, he would have informed the panel members of Plaintiff's intent, and would have made that clear during the hearing. (*Id.*) However, Plaintiff would have been responsible for securing the presence of his witnesses. (*Id.* at PageID.1083.)

Plaintiff claims that he told Mr. Van't Hof that he wanted to call witnesses. (ECF No. 156-5 at PageID.1114.) At the conclusion of the hearing, however, Defendant Butler asked, "is there anything else to be brought to the attention of the committee before their deliberation begins?" Mr. Van't Hof and Plaintiff both responded, "No." Plaintiff claims that someone on the panel told him that "it had already been taken care of" (ECF No. 170 at PageID.1444), but his assertion is contrary to the audio recording of the hearing, which indicates that Plaintiff did not request to call witnesses even though he was given the opportunity to do so. Moreover, although Plaintiff claims that the recording was "butchered" (ECF No. 156-5 at PageID.1115), he presents no evidence, other than his own speculation, that the recording was altered in any way.

Accordingly, Plaintiff fails to establish a due process violation by Defendants Emami, Butler, or Greiner.[2]

## IV.   Conclusion

For the foregoing reasons, I recommend that the MDOC Defendants' and the Corizon Defendants' respective motions for summary judgment be **granted** and that Plaintiff's remaining claims be **dismissed with prejudice**.

Dated: May 4, 2021                               /s/ Sally J. Berens
                                                SALLY J. BERENS
                                                U.S. Magistrate Judge

## NOTICE

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections

---

[2] In light of this conclusion, I find no need to address Defendants' argument that they are entitled to qualified immunity.

within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).